SUMMIT MEDICAL ASSOCIATES, P.C., William Knorr, M.D., et al., on behalf of themselves and their patients seeking abortions, Plaintiffs-Appellees,

v.

Bill PRYOR, in his official capacity as Attorney General and his agents and successors, and Ellen Brooks, in her official capacity as Montgomery District Attorney, etc., Defendants-Appellants.

No. 98-6129.

United States Court of Appeals,

Eleventh Circuit.

July 15, 1999.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-97-%-1149-N), Myron H. Thompson, Judge.

Before EDMONDSON, COX and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

The central issue raised in this interlocutory appeal is whether Alabama's Eleventh Amendment sovereign immunity bars this suit in federal court against the Governor, the Attorney General, and the District Attorney challenging the Alabama Partial-Birth Abortion Ban Act of 1997 ("partial-birth abortion statute") and the Abortion of Viable Unborn Child Act ("post-viability abortion statute"). We hold that Appellees' challenge to the statutes' criminal liability provisions falls squarely within the exception to the Eleventh Amendment embodied in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and, therefore, that the district court did not err in denying Appellants' motion to dismiss this § 1983 action on these grounds. However, with respect to Appellees' challenge to the private civil enforcement provision embodied in the partial-birth abortion statute, we conclude that, because Appellants have no enforcement authority over those specific provisions, the *Ex parte Young* exception does not apply, and Alabama's sovereign immunity bars this specific claim. Accordingly, we affirm in part, reverse in part, and remand this case with instructions to the district court to dismiss Appellees' challenge to the private civil enforcement provision of the partial-birth abortion statute.

I.

Appellees are three corporations that own abortion clinics, Summit Medical Association, P.C., Beacon Women's Center, and New Woman, All Women Health Care, and one physician, William H. Knorr, M.D. They initiated this action on July 24, 1997, in the United States District Court for the Middle District of Alabama against Fob James, Jr., then Governor of Alabama, Bill Pryor, Attorney General of Alabama, and Ellen Brooks, Montgomery District Attorney, alleging that the Alabama Partial-Birth Abortion Ban Act of 1997, Ala.Code §§ 26-23-1 to -6 (Supp.1998), and the Abortion of Viable Unborn Child Act, Ala.Code §§ 26-22-1 to -5 (Supp.1998), violate the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983 (1994). They sought injunctive and declaratory relief.[1]

In 1997, the Alabama state legislature enacted these statutes to impose criminal and civil penalties on the performance of certain types of abortion procedures. The partial-birth abortion statute prohibits any physician from "knowingly" performing a "partial-birth abortion,"[2] Ala.Code § 26-23-3, defined as "[a]n

_____

[1]The effective dates of these statutes were August 1, 1997 and August 12, 1997, respectively. Therefore, at the time of the filing of this action, neither statute had taken effect.

[2]In full, the partial-birth abortion statute provides:

§ 26-23-1. Title.

This chapter may be cited as the "Alabama Partial-Birth Abortion Ban Act of 1997."

§ 26-23-2. Definitions.

As used in this chapter, the following terms shall have the following meanings:

(1) FATHER. The biological father of the human fetus.

(2) MOTHER. The female who is pregnant with a live human fetus which may be subject to a partial-birth abortion under this chapter.

(3) PARTIAL-BIRTH ABORTION. An abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery.

(4) PHYSICIAN. A doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the state or any other individual legally authorized by

2

abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing

the fetus and completing the delivery," *id.* § 26-23-2(3). The performance of such an abortion constitutes a

Class C felony, punishable by a fine of not more than $5000 and imprisonment for up to ten years, and

triggers the possibility of license revocation under Alabama law. *See id.* § 26-23-3; *see also* Ala.Code §§

13A-5-2, -6(a)(3), -11(a)(3) (1994); Ala.Code § 34-24-360(4) (1997). Under the statute's private civil

enforcement provision, the performing physician also may be liable in a civil suit to the "father" of the fetus,

if he is married to the woman who underwent the abortion, or to the "maternal grandparents" of the fetus, if

---

the state to perform abortions. This definition shall also include any individual who is not a physician or is not otherwise legally authorized by the state to perform abortions, but who nevertheless performs a partial-birth abortion.

§ 26-23-3. Physician; prohibited action.

Any physician who knowingly performs a partial-birth abortion within this state and thereby kills a human fetus shall be guilty of a Class C felony and upon conviction thereof shall be punished as prescribed by law.

§ 26-23-4. Exception; life of the mother.

Section 26-23-3 shall not apply to a partial-birth abortion that is necessary to save the life of a mother.

§ 26-23-5. Relief; father and maternal grandparents.

The father, if married to the mother at the time she receives a partial-birth abortion procedure, and if the mother has not attained the age of 18 years at the time of the abortion, the maternal grandparents of the fetus, may in a civil action obtain appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion. The relief shall be limited to monetary compensation for all injuries, psychological and physical, occasioned by a violation under this chapter and monetary punitive compensation as allowed by law.

§ 26-23-6. Woman; prosecution.

A woman upon whom a partial-birth abortion is performed may not be prosecuted under this chapter for a conspiracy to violate this chapter or for any other offense which is unlawful under this chapter.

Ala.Code. §§ 26-23-1 to -6.

3

the woman is a minor at the time of the procedure. Ala.Code § 26-23-5. However, where the abortion "is necessary to save the life of the mother" the statute bars criminal and civil liability. *Id.* § 26-23-4.

On August 1, 1997, the effective date of the partial-birth abortion statute, the Alabama Attorney General sent letters to four Alabama district attorneys instructing them on his interpretation of the new statute.[3] The letters stated that for the purpose of prosecutions brought under the act, "a physician partially delivers a living fetus before killing the fetus [as proscribed by the act] when the physician deliberately and intentionally delivers into the vagina a viable fetus, or a substantial portion of the viable fetus, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus."

The post-viability abortion statute, on the other hand, prohibits any person from "intentionally, knowingly, or recklessly" performing or inducing any type of abortion "when the unborn child is viable."[4]

---

[3]The Attorney General stated that these instructions were given pursuant to Ala.Code § 36-15-14 (1991), which provides in relevant part: "The attorney general ... may at any time he sees proper, either before or after indictment, superintend and direct the prosecution of any criminal case in any of the courts of this state."

[4]In its entirety, the post-viability abortion statute provides:

§ 26-22-1. Legislative findings and intent.

(a) The public policy of the State of Alabama is to protect life, born and unborn. This is particularly true concerning unborn life that is capable of living outside the womb. The Legislature of the State of Alabama finds there are abortions being done in Alabama after the time of viability and in violation of its public policy.

(b) The Legislature specifically finds the following:

(1) Medical evidence shows there is a survival rate of babies born between ages 23 weeks to 29 weeks gestational age of 64 percent to 94 percent.

(2) In *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), the United States Supreme Court determined that viability may occur as early as 23 to 24 weeks gestational age. Also, the United States Supreme Court determined that requiring fetal viability testing at 20 weeks gestational age is constitutional, because there is up to a four week margin of error in determining gestational age.

(3) In the latest year of Alabama statistical reporting, 1994, there were reported

4

to be 182 abortions performed at 20 or more weeks gestational age. There were also 70 abortions performed where no gestational age was stated.

(c) Subject to life and health exceptions to the mother, it is the intent of the Legislature to ban abortions of any unborn child that is capable of living outside the womb. To permit otherwise is a wanton disregard of human life.

§ 26-22-2. Definitions.

The following words shall have the following meanings:

(1) ABORTION. The use of any means to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child.

(2) FERTILIZATION. The fusion of a human spermatozoon with a human ovum.

(3) GESTATIONAL AGE. The age of the unborn child as calculated from the first day of the last menstrual period of the pregnant woman.

(4) HOSPITAL. An institution licensed pursuant to the provisions of the law of this state.

(5) LIVE BIRTH. When used with regard to a human being, means that the human being was completely expelled or extracted from his or her mother and after such separation, breathed or showed evidence of any of the following: beating of the heart, pulsation of the umbilical cord, definite movement of voluntary muscles, or any brain-wave activity.

(6) MEDICAL EMERGENCY. The condition, which, on the basis of the physician's good-faith clinical judgment, so complicates a pregnancy as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(7) PREGNANT. The female reproductive condition of having a developing fetus in the body and commences with fertilization.

(8) UNBORN CHILD AND FETUS. An individual organism of the species homo sapiens from fertilization until live birth.

(9) VIABLE AND VIABILITY. The stage of fetal development when, in the judgment of the physician based upon the particular facts of the case before him or her and in light of the most advanced medical technology and information available to him or her, there is a reasonable likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support.

5

§ 26-22-3. Prohibition—Exceptions—Regulations—Penalties.

(a) *Prohibition.* Except as provided in subsection (b), no person shall intentionally, knowingly, or recklessly perform or induce an abortion when the unborn child is viable.

(b) *Exceptions.*

(1) It shall not be a violation of subsection (a) if an abortion is performed by a physician and that physician reasonably believes that it is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman. No abortion shall be deemed authorized under this paragraph if performed on the basis of a claim or a diagnosis that the woman will engage in conduct which would result in her death or in the substantial and irreversible impairment of a major bodily function.

(2) It shall not be a violation of subsection (a) if the abortion is performed by a physician and that physician reasonably believes, after making a determination of the viability of the unborn child in compliance with Section 26-22-4 relating to the determination of viability, that the unborn child is not viable.

(c) *Abortion regulated.* Except in the case of a medical emergency which, in the reasonable medical judgment of the physician performing the abortion, prevents compliance with a particular requirement of this subsection, no abortion which is authorized under subsection (b)(1) shall be performed unless each of the following conditions are met:

(1) The physician performing the abortion certifies in writing that, based upon his or her medical examination of the pregnant woman and his or her medical judgment, the abortion is necessary to prevent either the death of the pregnant woman or serious risk of substantial and irreversible impairment of a major bodily function.

(2) The physician's judgment with respect to the necessity for the abortion has been concurred in by one other licensed physician who certifies in writing that, based upon his or her separate personal medical examination of the pregnant woman and his or her medical judgment, the abortion is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman.

(3) The abortion is performed in a hospital.

(4) The physician terminates the pregnancy in a manner which provides the best opportunity for the unborn child to survive, unless the physician determines, in his or her good faith medical judgment, that termination of the pregnancy in that manner poses a significantly greater risk either of the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman than would other available methods.

6

Ala.Code § 26-22-3(a).  "Viable and viability" are defined in the statute as follows:

> The stage of fetal development when, in the judgment of the physician based upon the particular facts of the case before him or her in light of the most advanced medical technology and information available to him or her, there is a *reasonable likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support.*

-----

(5) The physician performing the abortion arranges for the attendance, in the same room in which the abortion is to be completed, of a second physician who shall take control of the child immediately after complete extraction from the mother and shall provide immediate medical care for the child, taking all reasonable steps necessary to preserve the child's life and health.

(d) *Penalty.*  Any person who violates subsection (a) commits a Class A felony. Any person who violates subsection (c) commits a Class C felony.

§ 26-22-4.  Viability testing.

Except in the case of a medical emergency, prior to performing an abortion upon a woman subsequent to her first 19 weeks of pregnancy, the physician shall determine whether, in his or her good faith medical judgment, the child is viable.  When the physician has determined that a child is viable, he or she shall report the basis for his or her determination that the abortion is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman.  When the physician has determined that a child is not viable after the first 19 weeks of pregnancy, he or she shall report the basis for such determination.

§ 26-22-5.  Construction.

Nothing in this chapter shall be construed to recognize a right to abortion or to make legal an abortion that is otherwise unlawful.

Ala.Code §§ 26-22-1 to -5.

The statute also contained the following severability provision:

> If any provision, word, phrase, or clause of this act, or the application thereof, to any person, entity, or circumstance shall be held invalid, such invalidity shall not affect the remaining provisions, words, phrases, clauses, or application of this act, which can be given effect without the invalid provision, word, phrase, clause, or application, and to this end, the provisions, words, phrases, and clauses of this act are declared to be severable.

Act of May 14, 1997, § 6, 1997 Ala. Acts 97-442.

7

*Id.* § 26-22-2(9) (emphasis added). After the nineteenth week of pregnancy, the statute requires all physicians performing abortions to make a good-faith medical judgment as to whether the fetus is viable. *See id.* §§ 26-22-2(9), -4.

Under the post-viability abortion statute, a person who intentionally, knowingly, or recklessly performs or induces a post-viability abortion has committed a Class A felony, punishable by imprisonment from ten to ninety-nine years and fines up to $20,000. *See id.* § 26-22-3(a), (d); *see also* Ala.Code §§ 13A-5-2, -6(a)(1),—11(a)(1). A physician may perform a post-viability abortion if he or she "reasonably believes that it is necessary to prevent either the death of the pregnant woman or the substantial and irreversible impairment of a major bodily function of the woman." Ala.Code § 26-22-3(b)(1). Under these circumstances, a physician must satisfy five additional procedural requirements, including written certification of the physician's judgment, written concurrence of another licensed physician, and performance of all reasonable steps necessary to preserve the life and health of the unborn child. *See id.* § 26-22-3(c)(1) to (5). Failure to comply with these requirements constitutes a Class C felony, punishable by imprisonment from one year and one day to ten years and fines up to $5000. *See id.* § 26-22-3(d). These requirements are waived, however, where the physician, in his or her reasonable medical judgment, determines that the nature of the medical emergency prevents compliance. *See id.* § 26-22-3(c).

Appellees allege that these statutes are unconstitutionally vague and can be construed to prohibit abortions performed in the first trimester of pregnancy, thus imposing an undue burden on the right of patients to seek abortions free from government interference.[5] Moreover, Appellees contend that the post-viability

---

[5]All Appellees perform abortions through the thirteenth week from the woman's last menstrual period ("LMP"). They allege that these abortions may fall within the proscription of the partial-birth abortion statute, and that they intend to continue to perform such abortions despite the existence of the statute. Appellees Summit Medical and Dr. Knorr perform abortions through twenty-four and a half weeks LMP. Similarly, they allege that these abortions may fall within the proscription of the post-viability abortion statute, and that they intend to continue performing such abortions despite the existence of the statute. As a consequence of these intentions, all Appellees allege that they fear prosecution under either or both statutes.

abortion statute imposes a further undue burden because it does not provide adequate safeguards for protecting a patient's health. Appellees also challenge the partial-birth abortion statute's private civil enforcement provision on the ground that it unduly burdens patients' rights to obtain abortions without government interference.

On September 4, 1997, Attorney General Pryor and District Attorney Brooks ("Appellants") filed a motion to dismiss alleging lack of standing, Eleventh Amendment immunity, and failure to state a claim on the merits. Governor James also moved to dismiss for lack of subject matter jurisdiction. On November 24, 1997, the district court held a hearing on these motions.

Thereafter, on January 26, 1998, the district court issued an order and a lengthy memorandum opinion denying the Governor's motion and granting in part, and denying in part, Appellants' motion.[6] *See Summit Med. Assocs. v. James,* 984 F.Supp. 1404 (M.D.Ala.1998) [hereinafter *Summit I* ]. Specifically, in granting Appellants' motion, the district court dismissed all claims for injunctive relief and those claims challenging the viability testing provisions of the post-viability abortion statute. The order left standing, however, Appellees' claims for declaratory relief against the other portions of both statutes. The district court also specifically rejected Appellants' Eleventh Amendment and standing defenses, reasoning that since the Appellants may be engaged in an ongoing violation of federal law, the *Ex parte Young* exception to Eleventh Amendment immunity applied.[7] Moreover, the district court found that Appellees had alleged a sufficiently credible threat of prosecution to establish standing to bring suit in federal court.

Appellants gave timely notice of appeal on February 13, 1998. They also filed a motion to stay proceedings in the district court pending a ruling on appeal. On March 19, 1998, the district court granted

---

[6]As part of its ruling, the district court also certified questions to the Supreme Court of Alabama, as allowed under Rule 18 of the Alabama Rules of Appellate Procedure. On February 13, 1998, however, the Alabama Supreme Court declined to answer the certified questions.

[7]The district court's reasoning is expressed both in its January 26 opinion, *see Summit I,* 984 F.Supp. 1404, and in its decision to stay proceedings pending resolution of this appeal, *see Summit Med. Assocs. v. James,* 998 F.Supp. 1339 (M.D.Ala.1998).

the motion to stay. *See Summit Med. Assocs. v. James,* 998 F.Supp. 1339 (M.D.Ala.1998) [hereinafter

*Summit II* ]. This interlocutory appeal followed.

II.

We review issues of federal subject matter jurisdiction *de novo. See University of S. Ala. v.*

*American Tobacco Co.,* 168 F.3d 405, 408 (11th Cir.1999). Similarly, a district court's denial of a motion

to dismiss on Eleventh Amendment grounds is a question of law subject to *de novo* review. *See Seminole*

*Tribe v. Florida,* 11 F.3d 1016, 1021 (11th Cir.1994), *aff'd,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252

(1996).

A.

*Jurisdiction*

As an initial matter, we must address our jurisdiction to review Appellants' claims. Appellants raise

two issues on interlocutory appeal: (1) whether the district court erred in concluding that Appellants were

not entitled to Eleventh Amendment immunity; and (2) whether the district court erred in holding that

Appellees have standing to commence this cause of action. We unquestionably have jurisdiction under the

collateral order doctrine to consider the question of sovereign immunity. However, we decline to exercise

discretionary pendent appellate jurisdiction to review the district court's determination of standing.

A district court's denial of a motion to dismiss on Eleventh Amendment immunity grounds is

appealable immediately. *See In re Burke,* 146 F.3d 1313, 1316 (11th Cir.1998) (citing *Puerto Rico Aqueduct*

*& Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993)),

*petition for cert. filed,* 67 U.S.L.W. 3394 (U.S. Dec. 1, 1998) (No. 98-906); *Schopler v. Bliss,* 903 F.2d 1373,

1377 (11th Cir.1990). This right to an interlocutory appeal stems from the collateral order doctrine of *Cohen*

*v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), as an exception to

the finality requirement of 28 U.S.C. § 1291 (1994). Under *Cohen,* an order is appealable if it (1)

"conclusively determine[s][a] disputed question," (2) "resolve[s] an important issue completely separate from

10

the merits of the action," and (3) "[is] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). In *Puerto Rico Aqueduct,* the Supreme Court squarely held that an order denying a defendant Eleventh Amendment immunity is a collateral order subject to immediate interlocutory appeal. *See* 506 U.S. at 147, 113 S.Ct. 684. Therefore, we have jurisdiction under 28 U.S.C. § 1291 to resolve Appellants' sovereign immunity claim now.

In contrast to the question of Eleventh Amendment immunity, however, we have held that a district court's denial of a motion to dismiss on justiciability grounds is *not* immediately appealable under the collateral order doctrine. *See Crymes v. DeKalb County,* 923 F.2d 1482, 1484-85 (11th Cir.1991) (ripeness); *see also Children's Healthcare Is a Legal Duty, Inc. v. Deters,* 92 F.3d 1412, 1418 (6th Cir.1996) (Batchelder, J., concurring) (citing *Triad Assocs., Inc. v. Robinson,* 10 F.3d 492, 496-97 n. 2 (7th Cir.1993) (holding that standing is not appealable immediately under collateral order doctrine); *Shanks v. City of Dallas,* 752 F.2d 1092, 1099 n. 9 (5th Cir.1985) (rejecting interlocutory appeal of standing on ground that issue was "enmeshed" with merits of cause of action); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 474-75 (2d Cir.1974) (refusing to review standing question on interlocutory appeal because resolution of issue was merely a " 'step[ ] towards final judgment in which [it] will merge' ") (citation omitted)). Although a district court's standing determination conclusively resolves a disputed question and settles an important issue separate from the merits of the case, courts have recognized that the issue of standing is not effectively unreviewable on appeal from a final judgment and, thus, fails the last prong of the collateral order doctrine. *See, e.g., Triad,* 10 F.3d at 496-97 n. 2. In light of this unambiguous precedent, we conclude that the question of standing does not fit within the collateral order doctrine, and, therefore, that Appellants may not as of right take an immediate interlocutory appeal on this issue.[8]

---

[8]At least one circuit judge has elected to consider standing as part of an otherwise proper interlocutory appeal of Eleventh Amendment immunity. In *Deters,* Judge Batchelder, writing separately, concluded *sua sponte* that the issue of standing necessarily comes before an appellate court when another issue is properly appealed. *See* 92 F.3d at 1419 (Batchelder, J., concurring). In reaching this determination, the Judge emphasized that "[c]onstitutional standing is always a threshold inquiry" on appeal because federal

Notwithstanding the unavailability of the collateral order doctrine to the standing issue, however, we may, within our discretion, exercise jurisdiction over otherwise nonappealable orders under the pendent appellate jurisdiction doctrine. *See Crymes,* 923 F.2d at 1485. Under this doctrine, a federal appellate court may address nonappealable orders if they are "inextricably intertwined" with an appealable decision or if "review of the former decision [is] necessary to ensure meaningful review of the latter." *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); *see also Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1365 (11th Cir.1997) (reviewing nonappealable order compelling production with appealable sanctions order); *United States v. Lopez-Lukis,* 102 F.3d 1164, 1167 n. 10 (11th Cir.1997) (reviewing nonappealable order striking portion of indictment with appealable order excluding evidence from trial). In *Swint,* the Supreme Court considered the propriety of exercising pendent appellate jurisdiction over an otherwise nonappealable issue that concerned parties different from those involved in the appealable qualified immunity question. *See* 514 U.S. at 41, 115 S.Ct. 1203. Although the Court declined to settle definitively the application of pendent appellate jurisdiction to related issues, it held that this use of pendent appellate jurisdiction was improper because the issues were neither intertwined nor essential to each other. *See id.* at 50-51, 115 S.Ct. 1203. Under this doctrine, therefore, we may exercise jurisdiction over standing *only* if standing and Eleventh Amendment immunity are either inextricably intertwined or the determination of one is essential to the resolution of the other.

This question is governed by our decision in *Moniz v. City of Fort Lauderdale,* 145 F.3d 1278 (11th Cir.1998). In *Moniz,* we considered on interlocutory appeal whether to review standing under our pendent appellate jurisdiction where Appellants had also appealed, under the collateral order doctrine, the district court's rejection of their qualified immunity defense. *See id.* at 1281 n. 3. Upon consideration of whether the

---

courts have "an independent obligation to examine [their] own jurisdiction." *Id.* Judge Batchelder elected to reach the merits of standing on appeal, therefore, not as an independently appealable collateral order, but as a part of a federal court's obligation to satisfy itself that a matter is justiciable. However, in light of our case precedent, *see Moniz v. City of Ft. Lauderdale,* 145 F.3d 1278 (11th Cir.1998), we do not have occasion to consider the merits of this argument.

issues were "inextricably intertwined" or whether a determination of one was "necessary to ensure meaningful review" of the other, we concluded the following:

> Because we may resolve the qualified immunity issue in this case without reaching the merits of appellants' challenge to Moniz's standing, ... we conclude that the latter issue does not come under either of these categories and thus does not fall within our pendent appellate jurisdiction under *Swint.*

*Id.* As in *Moniz,* we may resolve the Eleventh Amendment immunity issue here without reaching the merits of standing.[9] These issues are neither "inextricably intertwined" nor "necessary to ensure meaningful review" of one another. As the district court observed:

> [T]he attorney general defendants' arguments regarding the plaintiffs' alleged failure to show that they face an imminent and credible threat of prosecution [with respect to standing] ... are completely irrelevant to the eleventh-amendment-immunity issue that they raise on appeal.... By contrast, the attorney general defendants' contentions regarding the lack of an imminent prosecution are, of course, directly relevant to the distinct question[ ] of whether the plaintiffs enjoy standing to sue in federal court ... [and] are not implicated by the attorney general defendants' appeal to the Eleventh Circuit.

*Summit II,* 998 F.Supp. at 1350. Therefore, because we conclude that Appellants have failed to satisfy the test set forth in *Swint,* and because of our unambiguous precedent in *Moniz,* we decline to exercise discretionary pendent appellate jurisdiction to address here the question of Appellees' standing to commence this action. We turn, therefore, to the merits of sovereign immunity.

B.

*Eleventh Amendment*

The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment not only bars suits against a state by citizens of another state, but also applies equally to suits against a state initiated by that state's own citizens. *See Edelman v. Jordan,* 415 U.S.

---

[9]Qualified immunity, like sovereign immunity, is an immunity from litigation and not just from liability. *See Mitchell v. Forsyth,* 472 U.S. 511, 526-27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, we believe that our reasoning in *Moniz* applies with equal force to an interlocutory appeal of Eleventh Amendment immunity.

651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 13-15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Moreover, the Eleventh Amendment prohibits suits against state officials where the state is, in fact, the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). For example, if a lawsuit seeks to order the state officer to pay funds directly from the state treasury for the wrongful acts of the state, then the state is the real party in interest and the Eleventh Amendment bars the suit.

Under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, there is a long and well-recognized exception to this rule for suits against state officers seeking *prospective* equitable relief to end *continuing* violations of federal law. *See Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 269, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) ("We do not ... question the continuing validity of the *Ex parte Young* doctrine."). Because Appellees, citizens of Alabama, have sued Alabama state officers to obtain declaratory relief, the parties agree that this lawsuit must be dismissed unless it falls within *Ex parte Young* 's exception to the Eleventh Amendment.

The Eleventh Amendment generally does not bar the exercise of the judicial power of the United States where a plaintiff seeks to compel a state officer to comply with federal law. *See Ex parte Young,* 209 U.S. at 158-59, 28 S.Ct. 441. Because the enforcement of "an unconstitutional statute is void, and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States,' " the Supreme Court has held that the officer is not entitled to protection by the state's sovereign immunity. *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (quoting *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. 441); *see also Coeur d'Alene,* 521 U.S. at 288, 117 S.Ct. 2028 (O'Connor, J., concurring) ("The *Young* doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity."). This doctrine has, therefore, been described as a legal "fiction" because it creates an imaginary distinction between the state and its officers, deeming the officers to act

14

without the state's authority, and, hence, without immunity protection, when they enforce state laws in derogation of the Constitution. *See Pennhurst,* 465 U.S. at 114 n. 25, 104 S.Ct. 900.

Thus, the availability of this doctrine turns, in the first place, on whether the plaintiff seeks retrospective or prospective relief. As the Supreme Court has explained:

> *Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation. As we have noted: "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment."

*Papasan v. Allain,* 478 U.S. 265, 277-78, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (quoting *Green,* 474 U.S. at 68, 106 S.Ct. 423). Therefore, the Eleventh Amendment bars suits against state officials in federal court seeking retrospective or compensatory relief, but does not generally prohibit suits seeking only prospective injunctive or declaratory relief. *See Green,* 474 U.S. at 68, 106 S.Ct. 423. If the prospective relief sought is the functional equivalent of money damages, however, *i.e.,* "[i]t is measured in terms of a monetary loss resulting from a past breach of a legal duty," *Ex parte Young* does not apply. *Edelman,* 415 U.S. at 669, 94 S.Ct. 1347.

Because of the important interests of federalism and state sovereignty implicated by *Ex parte Young,* however, the doctrine is not without limitations—indeed, two are relevant to this appeal. First, the *Ex parte Young* doctrine applies only to ongoing and continuous violations of federal law. *See Papasan,* 478 U.S. at 277-78, 106 S.Ct. 2932; *Green,* 474 U.S. at 68, 106 S.Ct. 423. In other words, a plaintiff may not use the doctrine to adjudicate the legality of past conduct. *See Papasan,* 478 U.S. at 277-78, 106 S.Ct. 2932. This requirement protects states by setting "a minimum threshold for abrogating a state's constitutional immunity." *Booth v. Maryland,* 112 F.3d 139, 142 (4th Cir.1997), *cert. denied,* --- U.S. ----, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998). Second, in *Idaho v. Coeur d'Alene Tribe,* the Supreme Court recently said that the *Ex parte Young* doctrine does not apply where the equitable relief sought "implicates special sovereignty interests."

15

521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Thus, if prospective relief would invade a state's sovereignty as much as an award of money damages would, the action will be barred by the Eleventh Amendment.

Against this backdrop, we turn to the application of *Ex parte Young* to this lawsuit initiated by abortion providers against the Governor of Alabama, the Attorney General, and the District Attorney challenging the criminal liability provisions of Alabama's post-viability and partial-birth abortion statutes. Appellants raise two basic arguments in support of their immunity defense. First, they contend that the district court erred in concluding that Appellants were engaged in an ongoing and continuous violation of federal law. According to Appellants, Appellees have not challenged any action that an Alabama officer has undertaken or has threatened to undertake; rather, Appellees have challenged only the responsibilities such officers have in their status as state officials. Appellants argue that so bare a possibility of enforcement does not present a sufficient danger to federal rights to justify a federal court's invasion of Alabama's sovereign immunity. Second, Appellants argue that *Coeur d'Alene* 's limitation on *Ex parte Young* applies to this case because of the state's significant interest in regulating late-term abortions of viable fetuses. Because we believe that this case falls squarely within the *Ex parte Young* exception to the Eleventh Amendment, we find Appellants' arguments unavailing.

As we discussed earlier, *Ex parte Young* requires the allegation of an ongoing and continuous violation of federal law. *See Coeur d'Alene,* 521 U.S. at 281, 117 S.Ct. 2028 ("An allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction."). This requirement does not mean that the enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit. Rather, we agree with the district court that the ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, *i.e.,* designed to prevent injury that will occur in the future, and cases where relief is retrospective. As the Supreme Court explained in *Papasan,* "*Young* has been focused on cases in which

16

a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past." 478 U.S. at 277-78, 106 S.Ct. 2932. Similarly, in *Green v. Mansour,* the Supreme Court recognized that where there "was no threat of state officials violating the repealed law in the future," the Eleventh Amendment prohibited the issuance of a declaratory judgment to adjudicate past violations of federal law. *See* 474 U.S. at 73, 106 S.Ct. 423. Thus, where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied.

Appellants contend, however, that under *Ex parte Young,* a state officer's enforcement of an allegedly unconstitutional state law must be *imminent,* not merely threatened. We decline to adopt so limited a view of the *Ex parte Young* doctrine. Indeed, *Ex parte Young* recognized the very real reason a plaintiff may need a vehicle to challenge the constitutionality of a state law before enforcement is imminent. In *Ex parte Young,* plaintiffs brought suit in federal court against, *inter alia,* the Minnesota Attorney General to enjoin his enforcement of an allegedly unconstitutional state statute in Minnesota state court. *See* 209 U.S. at 129-32, 28 S.Ct. 441. The Supreme Court unambiguously recognized the efficacy of pre-enforcement challenges:

> It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the [plaintiff] from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the [plaintiff] from seeking judicial construction of laws which deeply affect [his] rights.

*Id.* at 147, 28 S.Ct. 441. The *Ex parte Young* doctrine does not demand that a plaintiff first risk the sanctions of imminent prosecution or enforcement in order to test the validity of a state law.

Moreover, Appellants' imminence requirement would essentially render *Ex parte Young* a nullity, leaving plaintiffs with only the most narrow window in which to initiate suit in federal court. Under the abstention doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), once a state prosecution is pending, a criminal defendant is barred from challenging the constitutionality of a state law in federal court except under very limited circumstances. In *Younger,* the Supreme Court held that a federal court could enjoin a pending state criminal proceeding only if "the danger of irreparable loss is both great and

17

immediate," and only if "the threat to the plaintiff's federally protected rights [is] one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* at 45-46, 91 S.Ct. 746 (internal citation and quotation marks omitted). But so long as the state criminal proceeding is " 'brought lawfully and in good faith,' " a state defendant is not free to sue in federal court to enjoin a state court prosecution. *Id.* at 49, 91 S.Ct. 746 (quoting *Douglas v. City of Jeannette,* 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324 (1943)). Thus, the initiation of a state criminal proceeding generally cuts short the availability of *Ex parte Young.*

When a state criminal proceeding is not pending, however, federal equitable relief is permissible. In *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), a plaintiff who had been threatened with arrest for trespass if he continued to distribute handbills at a shopping center sought a declaratory judgment that the state trespass statute was unconstitutional. The Supreme Court held that *Younger* did not bar the federal declaratory action because, since no state prosecution was pending, there was no danger of duplicating or disrupting the state court proceeding. *See id.* at 462, 475, 94 S.Ct. 1209. The Court also noted that "a refusal on the part of the federal courts to intervene ... may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity." *Id.* at 462, 94 S.Ct. 1209. Appellants' imminence requirement would force a plaintiff into precisely this predicament. In order for prosecution to be sufficiently imminent, a potential plaintiff would have to risk state criminal prosecution. If the plaintiff does not take that risk, however, by declining to engage in any arguably proscribed conduct, he must forego an adjudication of his claim in federal court.

We are unable to understand how, as a practical matter, a potential plaintiff will ever be able to predict when prosecution is indeed "imminent." Certainly, a prosecutor has no obligation to inform a target that she is planning to bring criminal charges, or that prosecution is imminent. These decisions are committed entirely to the sound discretion of the prosecutor. *Cf. United States v. Cespedes,* 151 F.3d 1329, 1332 (11th Cir.1998) (" '[S]o long as the prosecutor has probable cause to believe that the accused committed an offense

defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978))), *cert. denied,* --- U.S. ----, 119 S.Ct. 836, 142 L.Ed.2d 692 (1999); *United States v. Thomas,* 62 F.3d 1332, 1339 (11th Cir.1995) ("A prosecutor has no obligation to bring charges as soon as she has enough evidence to indict; instead, she may wait until she is satisfied that she has enough evidence to establish guilt beyond a reasonable doubt."). In short, if a plaintiff were barred from airing his grievance in federal court while an investigation was pending before a grand jury or prosecutor because he did not know and could not prove that his prosecution was imminent, and if a plaintiff were similarly barred while the prosecution was pending in state court—as he plainly would be under *Younger v. Harris*—then the avenue for seeking prospective relief in a federal forum would be slender indeed. We can find no such imminency requirement in Supreme Court case precedent, and we decline to graft one onto the long-recognized doctrine of *Ex parte Young.*

Here, Appellees unquestionably seek prospective relief—a declaratory judgment that the partial-birth and post-viability abortion statutes are unconstitutional. Although Appellants have not yet initiated prosecution, nor have they specifically threatened Appellees with prosecution, Appellants do intend to prosecute violators of both statutes, at least in cases where the fetus is viable.[10] Moreover, as Appellants concede, the Attorney General could withdraw the enforcement directive and prosecute partial-birth abortions pre-viability. Given the severity of the potential penalties—up to ten years for the partial-birth abortion statute and up to ninety-nine years for the post-viability abortion statute—Appellees would not have to be very risk averse to avoid any arguably proscribed conduct that may come within the reach of these statutes. In short, Appellees have sufficiently alleged an ongoing and continuous violation of federal law.[11]

---

[10]*See* Letter from Attorney General (August 1, 1997).

[11]We also find Appellants' remaining arguments unpersuasive. First, Appellants contend that, in *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Supreme Court held that the *Ex parte Young* doctrine requires some imminence of prosecution. *See id.* at

Turning to Appellants' second argument, we are not persuaded that *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), has any bearing on this case. In *Coeur d'Alene,* an Indian tribe sought both declaratory and injunctive relief to resolve the tribe's right to quiet enjoyment over certain state lands. *See id.* at 264-65, 117 S.Ct. 2028. The Supreme Court found that the Eleventh Amendment barred the action notwithstanding the fact that the tribe sought only prospective equitable relief. *See id.* at 287-88, 117 S.Ct. 2028. The Court reasoned that "if the Tribe were to prevail, Idaho's sovereignty interests in its lands and waters would be affected in a degree fully as intrusive as almost any conceivably retroactive levy upon funds in its Treasury." *Id.* at 287, 117 S.Ct. 2028. Thus, because the relief sought implicated the state's "special sovereignty interests" and was the "functional equivalent" of relief that would otherwise be barred by the Eleventh Amendment, the Court concluded that the *Ex parte Young* doctrine did not apply. *Id.* at 281, 117 S.Ct. 2028.

Unlike the quiet title action in *Coeur d'Alene,* the relief sought here does not implicate the state's real property interests that the Supreme Court found to be protected by the Eleventh Amendment. Undoubtedly Alabama has a significant interest in regulating abortions of viable fetuses. However, the remedy of a declaratory judgment is not the "functional equivalent" of a form of relief barred by the Eleventh Amendment. A declaratory judgment will establish only the constitutionality of *these statutes;* it will not prevent the state

---

381-83, 112 S.Ct. 2031. However, in *Morales,* the Court cited to *Ex parte Young* only in the context of determining whether there was sufficiently imminent and irreparable injury to support an award of *injunctive* relief. *See id.* at 381, 112 S.Ct. 2031. The Court never discussed the Eleventh Amendment or the *Ex parte Young* exception because it was not at issue in the case. Accordingly, *Morales* does not control this case. Second, Appellants argue that "*Young* does not apply when a defendant state official has neither enforced not threatened to enforce the allegedly unconstitutional state statute." *Children's Healthcare Is a Legal Duty, Inc. v. Deters,* 92 F.3d 1412, 1415 (6th Cir.1996). In *Deters,* however, the defendant in question had no authority to enforce the statutes under Ohio law. *See id.* at 1417. Moreover, the plaintiffs did not even seek to enjoin the statutes' enforcement. Rather, the plaintiffs asked the court to permit broader enforcement of the statutes by striking out certain provisions. *See id.* at 1416. Given the absence of any connection between the state officer defendant and any enforcement of the statutes, as well as the odd nature of the relief sought, the court could not justify applying *Ex parte Young. See id.* at 1414. Therefore, we similarly conclude that *Deters* does not apply to this matter.

from regulating late-term abortions in other ways. In contrast, the remedy in *Coeur d'Alene* would have resolved, for all time, Idaho's property interests in the disputed submerged lands. As the Court emphasized:

> The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory. To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the realities of the relief the Tribe demands.

*Id.* at 282, 117 S.Ct. 2028. Moreover, a successful challenge to the statutes at issue today will not in any way render this inherently prospective relief retrospective by implicating Alabama's treasury. *See Edelman,* 415 U.S. at 666-69, 94 S.Ct. 1347. Accordingly, the instant case is different from *Coeur d'Alene.*

In short, the Eleventh Amendment does not bar Appellees' challenge to the criminal liability provisions of the partial-birth and post-viability abortion statutes. We stress, however, that today we decide only the Eleventh Amendment issue raised in this interlocutory appeal. We have no occasion to reach, and do not examine in any way, whether the partial-birth and post-viability abortion statutes are constitutional under the Fourteenth Amendment. We hold only that the Eleventh Amendment does not bar this suit with respect to the criminal liability provisions.

We reach a different result, however, as to Appellants' claim that the Eleventh Amendment bars Appellees' challenge to the private civil enforcement provision of the partial-birth abortion statute.[12] Specifically, Appellants also argue, and we agree, that the doctrine of *Ex parte Young* cannot operate as an exception to Alabama's sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue.

---

[12]Appellants did not raise this argument below. Rather, they merely argued, and the district court rejected, that there was no state action with respect to the private civil enforcement provision. Although we generally decline to address arguments raised for the first time on appeal, it is within our discretion to do so. *See Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.,* 689 F.2d 982, 989 (11th Cir.1982). Because this issue "involves a pure question of law" and our "refusal to consider it would result in a miscarriage of justice," we will reach the merits of whether Appellees may challenge the private civil enforcement provision of the partial-birth abortion statute under the doctrine of *Ex parte Young. Id.* (citing *Martinez v. Mathews,* 544 F.2d 1233, 1237 (5th Cir.1976)).

21

The Eleventh Amendment bars Appellees' challenge to the *private* civil enforcement provision of the partial-birth abortion statute. In *Ex parte Young,* the Supreme Court observed:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.
>
> ... The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.

209 U.S. at 157, 28 S.Ct. 441. Therefore, unless the state officer has some responsibility to enforce the statute or provision at issue, the "fiction" of *Ex parte Young* cannot operate. Only if a state officer has the authority to enforce an unconstitutional act in the name of the state can the Supremacy Clause be invoked to strip the officer of his official or representative character and subject him to the individual consequences of his conduct. *See id.* at 159-60, 28 S.Ct. 441.

In *Fitts v. McGhee,* 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899), the Court expounded on the nature of this "connection" between the state officer and the challenged statute:

> There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see its enforcement. If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

*Id.* at 529-30, 19 S.Ct. 269. Accordingly, federal courts have refused to apply *Ex parte Young* where the officer who is charged has no authority to enforce the challenged statute. *See, e.g., Deters,* 92 F.3d at 1416-

22

17 (refusing to apply *Ex parte Young* to action against Attorney General where only local prosecutors had authority to enforce challenged statute). *Compare Shell Oil Co. v. Noel,* 608 F.2d 208, 211 (1st Cir.1979) ("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute."), *with Luckey v. Harris,* 860 F.2d 1012, 1015-16 (11th Cir.1988) (holding that Governor has sufficient contacts with alleged unlawful action because he is responsible for law enforcement, has residual power to commence criminal prosecutions, and has final authority to direct the Attorney General to prosecute on behalf of the state).

As Appellants correctly point out, only a *husband* or a *maternal grandparent, see* Ala.Code § 26-23-5, may enforce the civil provision of the partial-birth abortion statute. Since neither the Governor, the Attorney General, nor the District Attorney—the only defendants in this case—have any relationship to the enforcement of this provision, we conclude that the *Ex parte Young* doctrine does not apply. Therefore, we hold that Appellees' suit against the Governor, the Attorney General, and the District Attorney with respect to the private civil enforcement provision of the partial-birth abortion statute is barred by the Eleventh Amendment.

### III.

In sum, we affirm the district court's order denying Appellants' motion to dismiss with respect to the statutes' criminal liability provisions because Appellees challenge to these provisions plainly falls within the exception to the Eleventh Amendment established in *Ex parte Young.* However, the Eleventh Amendment does bar Appellees' challenge to the private civil enforcement provision of the partial-birth abortion statute because Appellants have no authority to enforce that provision as required by *Ex parte Young* and its progeny. Finally, we decline to exercise our pendent appellate jurisdiction over the question of standing. That issue may be litigated on appeal from any final judgment.

Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED with instructions to the district court to dismiss Appellees' challenge to the private civil enforcement provision of the partial-birth abortion statute.