SUMMIT MEDICAL ASSOCIATES,
P.C., et al., Plaintiffs,

v.

Don SIEGELMAN, etc.,
et al., Defendants.

No. Civ.A. 97–T–1149–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 26, 2001.

Kathryn Kolbert, Julie Kay, Simon Heller, New York City, David A. Gespass, Kathleen M. Johnson, Gespass & Johnson, Birmingham, AL, for Plaintiffs.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Robert D. Tambling, Charles B. Campbell, Andrew W. Christman, Office of the Attorney General, Montgomery, AL, Albert L. Jordan, Kimberly R. West, Wal-

lace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, Alice Ann Byrne, State Personnel Department, Montgomery, AL, William P. Gray, Jr., Gray & Associates, Birmingham, AL, P. Leigh O'Dell, Montgomery, AL, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

The important issue before the court is the constitutionality of the Alabama Partial–Birth Abortion Ban Act of 1997, 1975 Ala.Code §§ 26–23–1 to 26–23–6, which proscribes what it terms "partial-birth abortions." Most recently, in addressing a challenge to a similar statute from another State, the United States Supreme Court wrote:

"We again consider the right to an abortion. We understand the controversial nature of the problem. Millions of Americans believe that life begins at conception and consequently that an abortion is akin to causing the death of an innocent child; they recoil at the thought of a law that would permit it. Other millions fear that a law that forbids abortion would condemn many American women to lives that lack dignity, depriving them of equal liberty and leading those with least resources to undergo illegal abortions with the attendant risks of death and suffering. Taking account of these virtually irreconcilable points of view, aware that constitutional law must govern a society whose different members sincerely hold directly opposing views, and considering the matter in light of the Constitution's guarantees of fundamental individual liberty, this Court, in the course of a generation, has determined and then redetermined that the Constitution offers basic protection to the woman's right to choose.... We shall not revisit those

legal principles. Rather, we apply them to the circumstances of this case."

*Stenberg v. Carhart,* 530 U.S. 914, ——, 120 S.Ct. 2597, 2604, 147 L.Ed.2d 743 (2000) (citations omitted). With these comments in mind (but with the added restriction that a trial court lacks any discretion to revisit, and can only apply, these legal principles) and for the reasons that follow, this court holds that the Alabama statute, with the exception of one provision, violates the due process clause of the fourteenth amendment to the United States Constitution. A declaratory judgment against further enforcement of the infirm provisions will be entered.

## I.

The plaintiffs, Alabama-based providers of abortion services, are Summit Medical Associates, P.C., Dr. William H. Knorr, Beacon Women's Center, and New Woman, All Women Health Care. The plaintiffs have named as defendants in their official capacities the Governor of the State of Alabama, the Alabama Attorney General, and the Montgomery County District Attorney, who is sued also as a representative of the class of district attorneys for the State.

The plaintiffs originally challenged two Alabama abortion statutes as unlawful under the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983: the partial-birth abortion statute and the Alabama Abortion of Viable Unborn Child Act, 1975 Ala.Code §§ 26–22–1 to 26–22–5, which proscribes abortions performed after the fetus has achieved "viability." The plaintiffs dismissed their challenge to the second statute, leaving only their challenge to the partial-birth abortion statute to be now addressed by the court. The plaintiffs seek declaratory relief.[1] The jurisdiction

---

1. The plaintiffs sought both injunctive and declaratory relief, but by order entered on January 26, 1998, the court held that it will "refrain from hearing the plaintiffs' claims for injunctive relief, [and] will exercise jurisdiction over this lawsuit only to the extent that

the plaintiffs seek a declaratory judgment." *Summit Med. Assocs. v. James,* 984 F.Supp. 1404, 1436 (M.D.Ala.1998) (Thompson, J.), *aff'd in part and rev'd in part, Summit Med. Assocs. v. Pryor,* 180 F.3d 1326 (11th Cir. 1999).

of the court has been properly invoked pursuant to 28 U.S.C.A. §§ 1331 & 1343(a)(3).

This lawsuit is currently before the court on the plaintiffs' motion for judgment on the pleadings. In this motion, they submit that the partial-birth abortion statute is unconstitutional under *Stenberg v. Carhart,* the recent case, quoted in part at the beginning of this opinion, in which the Supreme Court invalidated a Nebraska partial-birth abortion statute.

Rule 12(c) of the Federal Rules of Civil Procedure provides that, "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1370 (11th Cir.1998). Judgment on the pleadings is appropriate here because the parties agree on the material facts and that these facts may be judicially noticed.

With this background in mind, the court now turns to the central issue: the constitutionality of the Alabama partial-birth abortion statute.

## II.

### A. *Abortion Procedures and Practices*

Because the expression "partial-birth abortion" is not a term with any fixed medical or legal content, a brief summary of pertinent abortion procedures and practices is necessary for understanding and applying the Supreme Court's analysis in *Carhart.* Unless otherwise indicated, the following account is based primarily on the *Carhart* Court's findings,[2] findings which the parties acknowledge apply here.[3]

About 90 % of abortions occur during the first trimester of a woman's pregnancy. Typically, these first trimester abortions are accomplished through "vacuum aspiration," a method which involves insertion of a vacuum tube into the uterus to evacuate the contents. About 10 % of abortions occur during the second trimester of pregnancy. The reasons women undergo abortions past the first trimester include pregnancy-related health problems, discovery of severe or fatal fetal anomalies, and sometimes less unusual circumstances such as simple youthful ignorance or a lack of patient resources at an earlier date. *See Summit Med. Assocs. v. James,* 984 F.Supp. 1404, 1417 (M.D.Ala. 1998) (Thompson, J.), *aff'd in part and rev'd in part, Summit Med. Assocs. v. Pryor,* 180 F.3d 1326 (11th Cir.1999).

The "dilation and evacuation" method (D & E) is employed for almost all second trimester abortions. D & E is a generic term for transcervical procedures performed 13 or more weeks into a pregnancy. In a D & E abortion, the physician induces dilation of the cervix and then uses instruments to pull a portion of the fetus through the cervix into the birth canal. Dismemberment of the fetus may occur both while the fetus is *in utero* and, especially (as a result of the counter-traction of the physician's instrument and the woman's cervix) while the fetus is pulled into the birth canal.

"Intact D & E" is a type of D & E abortion that may be performed 16 or more weeks into a pregnancy when the fetal skull is too big to pass through the cervix. Intact D & E begins with induced dilation of the cervix but entails removal of the fetus from the uterus through the cervix in one pass, that is, intact. If the fetus presents feet first (a breech presentation), the doctor pulls the fetal body, up to the

---

2. Pursuant to this court's power to consider judicially noticed facts under Rule 12(c), this discussion will also rely on some factual material published in an earlier published opinion in this case, *Summit Med. Assocs. v. James.*

3. *See* Defendants' answer to second amended complaint, filed August 9, 2000, p. 5; Plaintiffs' memorandum in support of their motion for partial judgment on the pleadings, filed September 25, 2000.

head, through the cervix and then collapses the skull to complete the extraction. The breech extraction version of intact D & E is sometimes called "dilation and extraction" or D & X. If the fetal head presents first (a vertex presentation), the doctor may collapse the skull before extracting the entire fetus through the cervix. While some doctors thus vary the intact D & E method to accord with the breech or vertex presentation, other doctors use the D & X method for all intact D & E abortions by converting any vertex presentation into a breech one before beginning the extraction. The Supreme Court in *Carhart* found the D & X and other intact D & E methods to be sufficiently similar to warrant using the D & X and intact D & E labels interchangeably.

D & X offers potential benefits for women in a variety of circumstances. D & X may benefit women seeking to abort nonviable fetuses such as hydrocephalic ones because reduction of an enlarged fetal cranium may reduce the risk of cervical injury. D & X may also be safest for women with prior uterine scars and those for whom induced labor would be especially risky. Some experts and clinicians believe more generally that, for women who have reached the second trimester, D & X offers safety advantages over other methods because it poses less risk of uterine perforation or cervical laceration from medical instruments, and less risk of injury from sharp fetal bone fragments; avoids retention of fetal tissue and parts; and takes less time, thus resulting in less blood loss, trauma, and exposure to anesthesia. There are no reliable estimates of the number of D & X abortions performed annually; current nation-wide estimates range from 640 to 5,000.

According to data collected in 1995, abortion practices in Alabama roughly mirror, in relevant part, the national pattern. Eighty-nine per cent of the abortions performed in Alabama in 1995 occurred during the first 13 weeks of pregnancy, 9.7 % occurred from 14 through 24 weeks, less than one per cent were performed after 19 weeks, none were reported after 24 weeks, and .88 % occurred at an unknown stage of pregnancy. The vast majority of abortions performed after 13 weeks resulted from traditional and intact D & E while induction methods accounted for only a small minority of such abortions. *See Summit Med. Assocs.*, 984 F.Supp. at 1417.

### B. *Stenberg v. Carhart*

As established by previous precedents, *see Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the *Carhart* Court articulated the constitutional framework for abortion rights and regulation in terms of three principles: First, before a fetus reaches viability, it is the pregnant woman's choice whether to continue or terminate her pregnancy. Second, a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before viability is unconstitutional; an undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. Third, the presumption shifts in favor of allowing government regulation or prohibition after the fetus reaches viability, when the State, in promoting its interest in the potentiality of human life, may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. *See Carhart*, 580 U.S. at ——, 120 S.Ct. at 2604.

The *Carhart* Court applied this framework to Nebraska's partial-birth abortion statute, which Nebraska contended was aimed at only the D & X method, and held the statute to be unconstitutional on two independent and adequate grounds: First, the Nebraska statute lacked an exception for the sake of the woman's health either pre-or postviability; and, second, the statute encompassed the D & E method, not just the less-used D & X method, thus,

imposing an undue burden on previability abortions. *See* 580 U.S. at ——, 120 S.Ct. at 2609. As will be demonstrated below, these two aspects of the Nebraska statute equally characterize the Alabama statute.

## C. *The Textual Similarity between the Alabama and the Nebraska Statutes*

The Alabama partial-birth abortion statute prohibits a physician from "knowingly" performing a "partial-birth abortion." 1975 Ala.Code § 26-23-3.[4] "Partial-birth abortion" is defined in the statute as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." § 26-23-2(3). Neither the term "partial-birth abortion" nor the foregoing definition has any technical or determinate meaning in the field of medicine. *See Summit Med. Assocs.,* 984 F.Supp. at 1414.

The statute provides only one exception to its ban, which applies where the abortion "is necessary to save the life of a mother." 1975 Ala.Code § 26-23-4. The statute contains no similar exception to preserve the mental or physical health of the pregnant woman.

The statute subjects physicians and others performing prohibited abortions to significant criminal liability—namely, conviction of a Class C felony punishable by a prison sentence up to ten years and a fine of not more than $ 5,000. *See* 1975 Ala. Code § 26-23-3. A physician convicted under the provision may face revocation of his or her professional license. *See id.;* §§ 13A-5-6, 13A-5-11; § 34-24-360(4). Pregnant women undergoing the prohibited procedure, however, are exempted from criminal prosecution. *See* § 26-23-6.

The language of the Alabama statute closely tracks that of the Nebraska statute, which prohibits the "partial birth abortion" procedure, defined as "an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery," Neb.Rev.Stat.Ann. § 28-326(9), and which, as stated, Nebraska contended was

---

4. This act reads, in its entirety, as follows:

" § 26-23-1. Short title.

This chapter may be cited as the 'Alabama Partial-Birth Abortion Ban Act of 1997.'

" § 26-23-2. Definitions.

As used in this chapter, the following terms shall have the following meanings:

(1) FATHER. The biological father of the human fetus.

(2) MOTHER. The female who is pregnant with a live human fetus which may be subject to a partial-birth abortion under this chapter.

(3) PARTIAL-BIRTH ABORTION. An abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery.

(4) PHYSICIAN. A doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the state or any other individual legally authorized by the state to perform abortions. This definition shall also include any individual who is not a physician or is not otherwise legally authorized by the state to perform abortions, but who nevertheless performs a partial-birth abortion

" § 26-23-3. Felony conviction.

Any physician who knowingly performs a partial-birth abortion within this state and thereby kills a human fetus shall be guilty of a Class C felony and upon conviction thereof shall be punished as prescribed by law.

" § 26-23-4. Life of mother exception.

Section 26-23-3 shall not apply to a partial-birth abortion that is necessary to save the life of a mother.

" § 26-23-5. Civil action.

The father, if married to the mother at the time she receives a partial-birth abortion procedure, and if the mother has not attained the age of 18 years at the time of the abortion, the maternal grandparents of the fetus, may in a civil action obtain appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion. The relief shall be limited to a monetary compensation for all injuries, psychological and physical, occasioned by a violation under this chapter and monetary punitive compensation as allowed by law.

" § 26-23-6. Conspiracy.

A woman upon whom a partial-birth abortion is performed may not be prosecuted under this chapter for a conspiracy to violate this chapter or for any other offense which is unlawful under this chapter"

aimed at the D & X method only. Most of the differences in the wording of the Alabama and Nebraska statutes involve minor linguistic or rhetorical variations.[5] There are three differences that conceivably could have some substantive legal import. Upon inspection, however, it is clear these differences are not determinative of the legal issues in the case before this court.

First, both statutes offer only one exception to the partial-birth-abortion prohibition, allowing such abortions in circumstances that render the method necessary to save the *life* of the mother. *See* 1975 Ala.Code § 26–23–4; Neb.Rev.Stat.Ann. § 28–328(1). The Nebraska life exception is possibly somewhat narrower in scope than Alabama's because it includes the additional restriction that the woman's life must be "endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." Neb.Rev.Stat.Ann. § 28–328(1). The Alabama statute has no such express limitation. More important than this distinction, however, is the commonality that neither statute makes an exception for the *physical* or *mental health* of the pregnant woman, or for any reason other than the life-endangerment of the woman. As will be further clarified below, it is the absence of a health exception (not the scope of the life-endangerment exception) that directly implicates *Carhart.*

Second, the text of the Nebraska statute provides a more confined definition of what counts as a prohibited abortion procedure and imposes an arguably higher scienter requirement by including an additional definition not present in the Alabama statute: While the Alabama legislature did not define the phrase "partially vaginally delivers a living fetus before killing the fetus and completing the delivery," the Nebraska statute further elaborates that "partially delivers vaginally a living unborn child before killing the unborn child" means "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." Neb.Rev.Stat.Ann. § 28–328(1). The text of the Alabama statute, taken alone, lacks limiting terms such as "deliberately" or "substantial", and, thus, on its face, the Alabama statute arguably sweeps far more broadly than does the Nebraska statute.

However, according to defendants, the limiting language present in the Nebraska but not the Alabama statute has been incorporated into Alabama law as a matter of enforcement policy set by a previous State Attorney General.[6] Although addressing a different aspect of the Nebraska law, the *Carhart* Court refused to credit the narrowing interpretations of the Nebraska attorney general, mentioning, among other reasons, that "the Court's precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law where, as here, that interpretation does not bind the state courts or local law enforcement.... Some present prosecutors (and future Attorneys

---

5. Nebraska's statute refers to an abortion of an "unborn child" while Alabama's describes that of a "living fetus." *See* Neb.Rev.Stat. Ann. § 28–326(9); 1976 Ala.Code § 26–23–2.

6. On August 1, 1997, the day upon which the partial-birth abortion statute took effect, the Alabama Attorney General forwarded a letter to four Alabama district attorneys instructing them that, for purposes of prosecutions brought under the statute, "a physician partially delivers a living fetus before killing the fetus [as proscribed by the statute] when the physician deliberately and intentionally delivers into the vagina a viable fetus, or a substantial portion of the viable fetus, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus." In his 1997 letter, the Attorney General stated that his instructions to the district attorneys were given pursuant to 1975 Ala. Code § 36–15–14, which provides in pertinent part as follows: "The attorney general ... may at any time he sees proper, either before or after indictment, superintend and direct the prosecution of any criminal case in any of the courts of this state."

General) might use the law at issue to pursue [a broader range of abortion procedures]." 580 U.S. at ——, 120 S.Ct. at 2603.

In the instant case, however, there is no need to decide whether the Alabama Attorney General's enforcement policy should be accepted as authoritative because it makes no difference to the outcome of this case. If, on the one hand, the Attorney General's narrowing construction should not be deemed binding, then the Alabama statute may sweep much more broadly than the Nebraska statute. On the other hand, if the narrowing construction is taken as binding law, then the Alabama statute conforms in that respect to the Nebraska statute, that is, to the very definition of prohibited procedures invalidated in *Carhart*. Either way, the Alabama statute prohibits all of the kinds of abortion procedures proscribed by the Nebraska statute, thus necessarily sharing in whatever constitutional infirmities characterize the latter.

Finally, the Alabama statute differs substantively from the Nebraska ban in that its maximum criminal penalties are less onerous than those of the Nebraska statute. *Compare* 1975 Ala.Code § 26–23–3 (a statutory violation is punishable by a prison term up to ten years and a fine of not more than $ 5,000) *with* Neb.Rev.Stat.Ann §§ 28–328(2), 28–105, 28–328(4) (a statutory violation is punishable by a prison term of up to 20 years and a fine of up to $ 25,000).[7] However, the *Carhart* Court's legal analysis is framed entirely in terms of the pregnant woman and the abortion procedures available to her, not the rights and liabilities of physicians. *See*, 530 U.S. at ——, 120 S.Ct. at 2609. In any event, because few physicians who would be de-

terred from performing certain abortions by the prospect of a 20–year sentence are likely to feel undeterred should they only risk a ten-year prison sentence, Nebraska's higher maximum punishment is not a difference that makes even an indirect difference for a woman's abortion rights or the application of *Carhart* to this case.[8]

In sum, the only substantive differences between the two partial-birth abortion statutes (that is, the fact that the text of the Alabama statute, as compared to the Nebraska statute, may provide a slightly more expansive life exception, a much broader definition of the class of prohibited abortion procedures, and a lower maximum prison sentence) are inconsequential under the reasoning of *Carhart*. For purposes of this case then, the text of the Alabama statute is appropriately treated by this court as identical to that of the Nebraska statute held invalid in *Carhart*.

Also, looking at the Alabama statute as a whole, the court declines to devise a narrowing construction that might save it from the fate of the invalidated Nebraska statute. First, the Alabama statute has not been construed by the Alabama state courts, and, in fact, the Alabama Supreme Court declined to answer this court's certified questions about the proper interpretation of the ban's reach. Second, the defendants did not offer any saving construction of the statute for purposes of the present motion for judgment on the pleadings, and this omission, together with the defendants' stated deference to the Supreme Court's findings in *Carhart*, suggests that the defendants themselves assume the Alabama and Nebraska statutes to be identical in all relevant respects.[9] Third, and as mentioned earlier, the *Carhart* Court re-

---

7. The Nebraska statute, however, is less onerous than the Alabama statute in that it lacks the private civil-enforcement provision of the latter. This provision authorizes monetary damages that may be sought by the "father," if married to the woman who underwent the partial-birth abortion, or by the "maternal grandparents of the fetus," if the woman was a minor at the time of the abortion. 1975 Ala.Code § 26–23–5. *See also supra* note 4.

8. In fact, all of the plaintiffs in this case have alleged they fear prosecution.

9. *See* Defendants' answer, filed August 9, 2000; Defendants' response to plaintiffs' motion for partial judgment on the pleadings, filed October 2, 2000.

1314

jected the Nebraska Attorney General's proffered saving construction of the essentially identical Nebraska statute as well as the appropriateness of certification to the Nebraska Supreme Court because, among other reasons, "the statute is [not] 'fairly susceptible' to a narrowing construction." 530 U.S. at ——, ·120 S.Ct. 2597, 147 L.Ed.2d 743. at 2616, 2617, 2597 (citations omitted). If the Nebraska statute is not fairly susceptible to a narrowing construction, it follows that the essentially identical Alabama statute is not either.

### D. The Unconstitutionality of the Alabama Statute

■ *No Health Exception:* Even at the postviability stage of a pregnancy when the State's legitimate interest in abortion regulation is at its height, the constitutional framework set out in *Carhart* requires that any abortion prohibition include an exception "where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 530 U.S. at ——, 120 S.Ct. at 2604 (quoting *Roe*, 410 U.S. at 164–65, 93 S.Ct. at 705). *Carhart* noted that

"The fact that Nebraska's law applies both pre- and postviability aggravates the constitutional problem presented. The State's interest in regulating abortion previability is considerably weaker than postviability.... Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation."

*Id.* at ——, 120 S.Ct. at 2609. This constitutional requirement of a health exception applies not only to situations where the pregnancy itself creates the health threat but also to those "where state regulations force women to use riskier methods of abortion." *Id.*

The *Carhart* Court found that a ban on "partial-birth abortion" without a health exception poses a "significant" risk to a woman's health "because the record shows that significant medical authority supports the proposition that in some circum-

stances, D & X would be the safest procedure." *Id.* at ——, 120 S.Ct. at 2610; *see also id.* at ——, 120 S.Ct. at 2613. The Court explained that a state prohibition on a procedure is not unconstitutional simply because a particular physician believes in the procedure's necessity. Rather, a ban without a health exception is constitutionally defective only where, as here, "substantial medical authority" supports the necessity of the procedure for some patients. *See id.* at ——, 120 S.Ct. at 2613. "The word 'necessary' in [the] phrase 'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother' ... cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases." *Id.* at ——, 120 S.Ct. at 2613 (citation omitted). "Neither can that phrase require unanimity of medical opinion." *Id.*

Like the Nebraska statute, the Alabama statute provides no health exception despite substantial medical opinion that lack of the D & X option poses a significant health risk to some women seeking abortions. There is no evidence in the record to suggest that Alabama abortion practices differ from the *Carhart* findings in any way that would lead to a different conclusion under the health-exception rule about the necessity of partial-birth abortions in certain circumstances according to appropriate medical judgment. For its lack of a health-exception alone, then, the Alabama statute is unconstitutional.

■ *Undue Burden:* The *Carhart* Court found that the Nebraska statute imposed an undue burden on a woman's right to chose to terminate her pregnancy before viability, and thus was unconstitutional, because the definition of "partial-birth abortion" in the statute did not distinguish D & E, commonly used for previability second trimester abortions, from the D & X procedure. *Id.* at ——, 120 S.Ct. at 2613. The Court remarked that, even if

the primary legislative aim was to target D & X abortions, the Nebraska legislature could have easily singled out that procedure and expressly excluded the D & E but yet did not do so. *Id.* Instead, "The plain language covers both procedures." *Id.* "By proscribing the most commonly used method for previability second trimester abortions[, that is, D & E], ... the statute creates a 'substantial obstacle to a woman seeking an abortion,' ... and therefore imposes an undue burden ....'" *Id.* at ——, 120 S.Ct. at 2618 (O'Connor, J., concurring) (citation omitted). If the language of the Nebraska statute plainly encompasses D & E abortions, the essentially identical language of the Alabama statute sweeps at least as broadly, thus also imposing an undue burden on abortion rights in violation of the fourteenth amendment.

## III.

For the reasons given above, this court holds that, with one exception now described, the Alabama partial-birth abortion statute violates the due process clause of the fourteenth amendment. The statute creates a private civil cause of action for monetary damages that may be brought by the "father," if married to the woman who underwent the partial-birth abortion, or by the "maternal grandparents of the fetus," if the woman was a minor at the time of the abortion. *See* 1975 Ala.Code § 26–23–5.[10] This private civil-enforcement feature of the statute has, however, been removed as an issue in this case. *See Summit Med. Assocs.*, 180 F.3d at 1341 (eleventh amendment sovereign immunity bars the abortion providers' challenge to the private civil enforcement provision). An appropriate judgment will therefore be entered granting the plaintiffs' motion for judgment on the pleadings and declaring the statute, with the exception of the private civil-enforcement provision, to be unconstitutional.

10. *See also supra* note 4.

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) The motion for judgment on the pleadings, filed by plaintiffs Summit Medical Associates, P.C., Dr. William H. Knorr, Beacon Women's Center, and New Woman, All Women Health Care on September 25, 2000, is granted.

(2) Judgment is entered in favor of plaintiffs and against defendants Don Siegelman, as Governor of Alabama, Bill Pryor, as Alabama Attorney General, and Ellen Brooks, as District Attorney for Montgomery County, Alabama.

(3) It is DECLARED that the Alabama Partial–Birth Abortion Ban Act of 1997, 1975 Ala.Code §§ 26–23–1 to 26–23–6, with the exception of the private civil-enforcement provision, 1975 Ala.Code § 26–23–5, is unconstitutional.

It is further ORDERED that costs are taxed against the defendants, for which execution may issue.